# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ZUBAIR TAALIBUDDEEN,** | : | **Civil No. 1:22-cv-1354** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **WALMART, INC.,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

This case, which was reassigned to the undersigned on March 18, 2026, involves the arrest of the plaintiff, Zubair Taalibuddeen, for retail theft. The undisputed facts show that tags on two items Taalibuddeen scanned at a Walmart store in Etters, PA belonged to items with lower prices than the items he stated that he intended to purchase. The plaintiff alleges he had nothing to do with the switched tags and that the Walmart loss prevention officer who called the police targeted him out of racial animus as demonstrated by her calling him a racial slur. He now alleges that defendant Walmart, and the arresting officer, Defendant Douglas Klinefelter, engaged in false imprisonment, false arrest, and malicious prosecution, by detaining

and arresting him for retail theft. He also alleges the defendants violated his right to Equal Protection under the 14th Amendment by racially targeting him for arrest.[1]

After a review of the evidence in this case, and viewing the facts in the light most favorable to the nonmoving party, the plaintiff, we conclude that Officer Klinefelter's actions in arresting the plaintiff are shielded by qualified immunity since, by the plaintiff's own account, there is no evidence his actions were racially motivated and he acted in reliance on the statements of the loss prevention manager that a crime had occurred. However, questions of fact exist as to whether the actions of the Walmart loss prevention manager were lawful or motivated by racial bias. Accordingly, we will GRANT Defendant Klinefelter's motion for partial summary judgment and DENY Defendant Walmart's motion for summary judgment.

## I.    Factual Background

On September 1, 2020, the plaintiff, Zubair Taalibuddeen, an African American male, was shopping at Walmart in Goldsboro, PA, intending to buy a futon sofa and small area rug. (Doc. 7, ℗℗ 4, 9). Taalibuddeen alleges that he obtained both the futon and rug from their areas of the store, placed them in his cart, and continued

---

[1] The plaintiff's amended complaint also contains a constitutional claim of excessive force and state law claims for assault and battery involving Officer Klinefelter's arrest of the plaintiff. Officer Klinefelter does not challenge these claims in the instant motion for summary judgment and our factual summary does not include the facts forming the basis of those claims.

to the self-check register, but noted he was being watched by the Walmart loss prevention manager, Michelle Reder. (Id., ¶¶ 10). At the register, the plaintiff's complaint alleges that he noticed four barcodes on the futon box and, assuming they were all the same, scanned one of them and purchased his items. (Id., ¶ 11). He stated that he scanned the only barcode of the rug which he believed matched the item purchased. (Doc. 55-6, at 21). He also testified that he believed the barcode from the rug he purchased matched the correct price that was associated with the product. (Id., at 22). The total for his purchase of the futon and rug was around $40. (Doc. 56, ¶ 20).

When the plaintiff began to exit the store after completing his purchase, he was stopped by a store employee and asked to see his receipt. (Doc. 7, ¶ 12). He asked why he was being asked for a receipt when other customers were not and the employee stated that it was because his cart was bigger. (Id., ¶ 13). The plaintiff responded that he believed he was being racially profiled. (Id.) He then alleges that loss prevention manager Michelle Reder asked him to walk with her to the register and scanned the items, including all the barcodes on the futon box, then accused him in a hostile tone of placing the barcodes on the box. (Id., ¶¶ 14-15). When the plaintiff denied placing the barcodes on the box, the plaintiff alleges Reder responded, "I can guarantee if I check the cameras, I will see you committing this crime because I know your type," then clarifying, "you know what I mean, you

Niggers are always trying to get over." (Id., ¶¶ 15-16). At that point, according to the plaintiff, he asked for the manager and for his money back but instead Reder asked him to come to her office. (Id., ¶ 16). The plaintiff refused and instead asked her to call the police. (Id.)

While the plaintiff's complaint identifies Reder's suspicions of the plaintiff as motivated by racial bias, Walmart purports that Reder's actions were based on her observation of suspicious behavior on the part of the plaintiff. On this score, Walmart states that Reder became aware of the plaintiff when she viewed him via video surveillance from the asset protection office taking SD memory cards from a display that required a Walmart associate's assistance to remove and saw him place them into his cart and pocket. (Doc. 56, ¶¶ 11, 15). What happened to the SD cards is seemingly unknown and an issue that is disputed. The plaintiff acknowledged only that he removed one SD card from the display, which he stated was unlocked, and decided later not to purchase it. (Doc. 55-6, at 19). Reder informed the responding officer she believed the plaintiff was flushing the SD cards down the toilet, but no SD cards were ever located. (Doc. 53, ¶¶ 40-41).

After observing the plaintiff remove the SD card from the rack which is usually locked, but the plaintiff alleges was not that day, Reder observed the plaintiff at the self-checkout register attempt to scan the futon box "in a peculiar way" and then scan the rug for a total purchase of approximately $40. (Doc. 56, ¶ 20). She also

noticed the register did not prompt the plaintiff to purchase a warranty for the futon which is normally triggered by scanning items over $50 like futons. (Id., ℙ 22). After asking an associate how much futons usually cost and learning they are typically around $200, Reder became suspicious that the plaintiff was committing retail theft and radioed the Walmart associate in the vestibule who stopped the plaintiff as he exited and asked to see his receipt. (Id., ℙℙ 23-26). According to Walmart, it was the front-end coach, not Reder, who approached the plaintiff in the vestibule and asked him to accompany her to asset protection, which the plaintiff declined, but that the plaintiff voluntarily accompanied her back into the store so the futon and area rug could be scanned. (Id., ℙℙ 28-29). Reder then met the plaintiff near the customer service desk and examined his receipt, confirming the items listed did not match the items he had scanned. (Id., ℙ 30). Reder also observed a barcode, which was later discovered to have been taken from a folding table, (id., ℙ 32), on the futon box that had been torn and placed on the box. (Id., ℙ 31). She called the police believing that a retail theft had occurred. (Id., ℙ 37). Reder denies using any vulgar or racially prejudiced language in her interaction with the plaintiff and alleges her observations and interactions with him were motivated by his suspicious behavior which, per her training and experience, indicated he was engaging in retail theft. (Doc. 55-5, ℙℙ 44-46).

According to Walmart, the plaintiff voluntarily waited for the police to arrive and no one from Walmart told him he was not free to leave, confined or locked the plaintiff in a physical space, touched him, or utilized a weapon or force to keep him in the building. (Doc. 56, ¶¶ 38-39). Nonetheless, the plaintiff testified that he did not feel free to leave, stating that Reder told him not to go anywhere and even had people follow him to the bathroom giving him the impression that if he had tried to leave "it would have been a huge problem." (Doc. 55-6, at 24).

Defendant Officer Douglas Klinefelter responded to the Walmart location and Reder advised him that the plaintiff had taken SD memory cards, had tampered with barcodes, and that the plaintiff was in the men's restroom flushing the SD memory cards down the toilet. (Doc. 56, ¶ 42). Officer Klinefelter went into the bathroom to confront the plaintiff but no SD cards were located. (Doc. 53, ¶ 41). Officer Klinefelter, Reder, and the plaintiff then watched the video surveillance footage together. (Id., ¶ 44). What the video showed is subject to three different interpretations. Officer Klinefelter alleges that, during the video review, Reder identified to him where the memory cards were taken and placed in the plaintiff' pocket, where the futon and area rug were obtained, and where the barcode switching occurred. (Id.) Walmart states only that Reder identified to Officer Klinefelter where the SD memory cards were taken and placed into the plaintiff's pocket and where the futon and area rug were obtained, but does not state the video showed where the

barcode switching occurred. (Doc. 56, ¶ 48). For his part, the plaintiff testified that the videos watched by the officers "show nothing whatsoever." (Doc. 55-6, at 25).

Based upon the statements from the loss prevention manager as well as his review of the surveillance video and the circumstances showing the barcodes had been switched for barcodes of a lower price, Officer Klinefelter arrested the plaintiff and charged him with retail theft and receiving stolen property. (Doc. 53, ¶¶ 45, 47). The plaintiff testified that he asked why he was being arrested when the video did not show him doing anything and the officer stated, "it's not on me to prove whether you're innocent or guilty. That's on the higher courts." (Doc. 55-6, at 25). While the plaintiff alleges the investigation initiated by Reder was racially motivated and she used a racial slur against him, he testified that he could not say whether Officer Klinefelter was racially profiling him and that "he didn't say anything racial or anything of that matter." (Doc. 55-6, at 34).

After the plaintiff was arrested, Reder located the table from which the barcode had been torn and identified a torn label associated with the kitchen rug. (Doc. 53, ¶¶ 50-51). The defendants have included copies of two receipts which demonstrate the prices of the barcodes scanned and purchased by the plaintiff, totaling $40.66, and the true prices of the items he attempted to purchase, totaling $253.21. (Id., ¶ 57).

At the preliminary hearing on the charges, Taalibuddeen claims Reder and Officer Klinefelter offered false testimony to the court. (Doc. 7, ¶ 24). The criminal case was eventually dismissed against the plaintiff, however, the defendants argue it was not a reflection of the evidence but "due to a technical error with the COVID-19 pandemic." (Id., ¶ 62).

Taalibudeen commenced this action *pro se* by filing a complaint on August 31, 2022. (Doc. 1). After the court concluded he failed to state a claim upon which relief could be granted, he filed an amended complaint. (Doc. 7). His amended complaint named Newberry Township, Officer Klinefelter, and Walmart as defendants. Taalibudeen alleges Officer Klinefelter violated his constitutional rights under the Fourth and Fourteenth Amendments stating claims of false arrest, excessive force, malicious prosecution and violations of his right to equal protection. He also alleges state law tort claims against Officer Klinefelter and Walmart, sounding in assault, battery, false arrest, false imprisonment, defamation, and malicious prosecution. On January 24, 2024, the Court dismissed the plaintiff's Monell[2] claim against Newberry Township as well as the plaintiff's state law tort claims of defamation against Officer Klinefelter and Walmart and assault and battery claims against Walmart. (Doc. 36). Thus, the plaintiff's complaint proceeded on the

---

[2] Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978).

constitutional claims and tort claims of assault, battery, false arrest, false imprisonment, and malicious prosecution against Officer Klinefelter and the state law tort claims of false arrest, false imprisonment, and malicious prosecution against Walmart. Following a period of discovery, the remaining defendants, Officer Klinefelter and Walmart have filed separate motions for summary judgment. (Docs. 52, 55). Officer Klinefelter's motion for partial summary judgment does not challenge the plaintiff's claims of assault, battery, and excessive force. Walmart moves for summary judgment on all claims against it. These motions are fully briefed and ripe for disposition. (Docs.53, 54, 56, 57, 60, 61). For the reasons that follow, we will grant Officer Klinefelter's motion for partial summary judgment but deny Walmart's motion for summary judgment.

## II.    <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendants have also moved for summary judgment on some of the plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty

9

and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla

10

of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark New Jersey v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon

11

bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. Id. Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

**B. Officer Klinefelter is Entitled to Qualified Immunity from The Plaintiff's Fourth Amendment Claims.**

We first address the claims against Defendant Officer Klinefelter, who argues he is entitled to summary judgment of the plaintiff's constitutional claims of false arrest and malicious prosecution because he is entitled to qualified immunity. The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005).

In accordance with this doctrine, government officials will be immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a

13

constitutional right" and "the right was clearly established" at the time of the objectionable conduct. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances presented by the particular case at hand. <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 (2009). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202. This inquiry "must be undertaken in light of the specific context of the case." <u>Id.</u> at 201. Accordingly, "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 253 (3d Cir. 2010).

The court is no longer required to conduct these two inquiries sequentially, <u>Pearson</u>, 129 S.Ct. at 820, and it may forego difficult constitutional issues and confer qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. <u>Id.</u> Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the

14

deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299–300 (3d Cir.2000); Crouse, 668 F.Supp.2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir.1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)."). Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir.2010).

Fundamental to the plaintiff's claims of false arrest and malicious prosecution is the concept of probable cause. At the outset, the plaintiff alleges that Officer Klinefelter falsely arrested him without probable cause. This federal constitutional claim implicates Taalibuddeen's rights under the Fourth Amendment to the United States Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and now Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV. Under the Fourth Amendment, an arrest without probable cause is a constitutional violation that may be redressed under 42 U.S.C. § 1983. See

15

Walmsley v. Philadelphia, 872 F.2d 546, 551 (3d Cir. 1989) (citing Patzig v. O'Neill, 577 F.2d 841, 848 (3d Cir. 1978)).

However, in order to make out a false arrest claim, a plaintiff must demonstrate that police lacked probable cause to arrest. Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). Thus, proof that probable cause was lacking is essential to any § 1983 claim arising out of the arrest or detention of an individual. A lack of probable cause is also an essential element of the malicious prosecution claim.[3] For purposes of the Fourth Amendment, probable cause to arrest exists "whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." U.S. v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). An arrest by a police officer without a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). In conducting an inquiry into whether probable cause to arrest existed, a court should consider the totality of the circumstances presented, and "must assess the knowledge

_____

[3] See Washington v. Hanshaw, 552 Fed. Appx. 169, 173 (3d Cir. 2014) ("Our precedents are clear that § 1983 plaintiffs alleging arrest and prosecution absent probable cause may bring malicious prosecution claims under the Fourth Amendment . . .").

16

and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest." United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002).

Although "[t]he probable-cause standard is incapable of precise definition or quantification," Maryland v. Pringle, 540 U.S. 366, 371 (2003), all interpretations of probable cause require "a belief of guilt that is reasonable as opposed to certain." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citing Hill v. California, 401 U.S. 797, 804 (1971)). Probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Wright, 409 F.3d at 602 (quoting Adams v. Williams, 407 U.S. 143, 149 (1972) ). Accordingly, the evidentiary standard for probable cause is significantly lower than that required for conviction. Id. (citing Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)); see also Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (holding that probable cause requires only a "fair probability" that a person committed the relevant crime). Because an arrest is made with probable cause if at the moment it was made the facts and circumstances within the officer's knowledge "were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense," Beck v. Ohio, 379 U.S. 89, 91 (1964), the constitutional validity of an arrest does not turn on whether the suspect actually committed any crime, Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003).

17

Thus, "[t]he determination that probable cause exists is fundamentally a factual analysis that must be performed by officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed." United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984). Although officers on the scene may draw inferences and make deductions that might elude an untrained person, United States v. Cortez, 449 U.S. 411, 418 (1981), "an officer's inferences and deductions can only justify a warrantless arrest if the government satisfies its burden of establishing the probable cause necessary to support the arrest," Myers, 308 F.3d at 255. While "[g]enerally, the existence of probable cause is a factual issue. Deary v. Three Un–Named Police Officers, 746 F.2d 185, 191 (3d Cir. 1984)[,] [s]ummary judgment can be granted in an appropriate case on probable cause, id. at 192." Groman v. Twp. of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995).

Given the fact-bound nature of the probable cause determination, it is frequently an issue reserved for the jury. And, here, each of the parties in the case have a different interpretation of exactly what evidence was available at the time of the arrest. All parties agree that Officer Klinefelter, the plaintiff, and Ms. Reder reviewed the surveillance footage together. But the details of exactly how they formed the probable cause to believe the plaintiff had committed retail theft are not as straightforward as the defendants argue. For example, it appears from Defendant

18

Klinefelter's statement of facts that Michelle Reder based her suspicion that the plaintiff had committed retail theft on his behavior throughout the store, the fact that he removed SD cards from a shelf that only associates were supposed to access, and the fact that the plaintiff scanned a tag that reflected the incorrect price on the futon. (Doc. 53-2). And it does not appear that anyone alleges Reder had reviewed the surveillance footage which allegedly showed the plaintiff switching the tags before she called the police. Officer Klinefelter's statement of facts states that Ms. Reder showed him in the surveillance footage which showed "where the barcode switching occurred," (doc. 53, ₱ 44), but Reder's affidavit states only that she identified to Officer Klinefelter where the plaintiff took the SD memory cards and placed them into his pocket, and where he obtained the futon and area rug. (Doc. 53-2, ₱ 38). It was not until after Defendant Klinefelter and the plaintiff left the store that she "located the folding table from which the barcode had been torn, as well as the torn label for the kitchen rug." (Id., ₱ 47). Indeed, Defendant Klinefelter confirms in his brief in support of his motion for summary judgment that, while she suspected the wrong barcodes were scanned based upon the price of the item and the fact that no warranty was prompted, it was not until later that she identified on the video where she saw this occur. (Doc. 54, at 13). Later in the brief, Defendant Klinefelter again states that he confirmed Reder's statements with video surveillance footage "where

[Ms. Reder] identified key portions related to the suspected retail theft to him," but precisely what that video footage showed is, again, not entirely clear.

What the defendants most vehemently allege was shown in the video was him removing SD cards from a rack. However, there is no other evidence that the plaintiff intended to steal the SD cards. Thus, the defendants allege part of what formed the probable cause to detain and arrest the plaintiff was Reder's observation that the plaintiff took SD cards from a display that required a Walmart associate's assistance to remove and place them into his cart and pocket. (Doc. 53, ℙ 19). Officer Klinefelter alleges that is what he observed on the surveillance video prior to arresting the plaintiff. (Doc. ℙ 44). The plaintiff contends that the rack was left unlocked and confirms that he did not purchase the SD cards. (Doc. 53-). Yet, despite the defendants relying heavily upon their suspicion that the plaintiff intended to steal these SD cards, it does not appear the SD cards were ever located. Instead, Reder affidavit states she believed Mr. Taalibuddeen flushed the SD cards down the toilet. (Doc. 53-2, ℙ 31), but Officer Klinefelter, who met the plaintiff in the bathroom, confirmed he did not find any SD cards. (Doc. 53, ℙℙ 40-41).

In our view, concluding as a matter of law that probable cause existed both for the loss prevention manager to detain Taalibuddeen, and the officer to arrest him, would require us to credit the statements of the officer and loss prevention manager over the plaintiff, a task which is exclusively reserved for a jury. Indeed, to the extent

20

Officer Klinefelter relied upon video surveillance evidence in forming probable cause, in our view, factual discrepancies exist with regard to precisely what the video evidence showed. Moreover, Officer Klinefelter confirms he relied heavily upon the professional opinion of the loss prevention manager that an attempted retail theft had occurred. In his brief in support of his motion, he specifically argues that "a host of facts place the reliability of Ms. Reder beyond reproach and contribute to Officer Klinefelter's formulation of probable cause." (Doc. 54, at 12-13). And the defendant argues there is no evidence she had any reason to assert false accusations about the plaintiff. (Id., at 13). However, crediting the sworn testimony of the plaintiff and viewing the evidence in the light most favorable to him, the loss prevention manager's conclusion that he had attempted retail theft was tainted by racial bias as evidenced by the racial slur the plaintiff alleges she used against him. And, while Reder vehemently denies using any slurs or being motivated by racial bias, our conclusion on this score would require us to resolve a question of fact.

Having found that Taalibudeen's constitutional claims with regard to whether probable cause existed to arrest him is fact-bound in nature, and the evidence, including each parties' statements regarding how they came to conclude he had committed a crime, does not undisputedly answer the question of whether Officer Klinefelter had probable cause to arrest the plaintiff, we analyze the issue of qualified immunity as to this claim starting from the second prong, whether it would

21

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. On this score, the Third Circuit has instructed:

> "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 572 U.S. 765, 778–79 (2014). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.' " Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). That way the "immunity protects all but the plainly incompetent or those who knowingly violate the law." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting White v. Pauley, 580 U.S. 73, 79 (2017) (per curiam)). To determine whether a right is clearly established, we first state the right at the appropriate level of generality, and then determine whether the right was clearly established at the time the events occurred.
>
> When framing the constitutional right at issue, the Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." al-Kidd, 563 U.S. at 742. Rather, we must frame the right at issue with "a high 'degree of specificity,' " District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)), accounting for both the "specific facts at issue," Kisela, 138 S. Ct. at 1153, and the "specific context" facing the officers, Spady, 800 F.3d at 638. Specificity is "particularly important in excessive force cases," City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019) (per curiam), because "it is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts," Kisela, 138 S. Ct. at 1152 (quoting *Mullenix*, 577 U.S. at 12).

Kelley v. O'Malley, No. 22-1688, 2024 WL 1208080, at *2–3 (3d Cir. Mar. 21, 2024).

22

Thus, the relevant inquiry is whether it is clearly established that an officer who arrests an individual based upon statements by a loss prevention manager that she believed a customer had committed retail theft based on her observations of his behavior and the undisputed fact that the customer had scanned and purchased two items both of which had incorrect price tags affixed to them, clearly violates a well established constitutional right. For the purposes of qualified immunity, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals." Kelley, 2024 WL 1208080, at *4 (quoting James v. New Jersey State Police, 957 F.3d 165, 172 (3d Cir. 2020)).

In framing the issue with the high degree of specificity required by the Third Circuit, we find no analogous binding Supreme Court precedent, Third Circuit precedent, or robust consensus of cases of persuasive authority in the Courts of Appeals, and the plaintiff points us to none, stating that it is clearly established that an officer who arrests and initiates charges against a suspect based upon the statements of a loss prevention manager that the suspect committed retail theft, violates the constitution. Thus, although we do find a question exists as to exactly what Officer Klinefelter viewed in the video and whether it showed Taalibuddeen actually switching the tags on the merchandise, in the narrow factual setting which applies to Officer Klinefelter's actions, we cannot say "the right's contours were

23

sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kelley at *2. Accordingly, we conclude that Officer Klinefelter is entitled to qualified immunity on the Fourth Amendment claims.

### C. **Defendant Klinefelter Is Entitled To Immunity From The State Law Tort Claims**

These factual considerations lead us to conclude that Defendant Klinefelter, as an officer of the state acting in his official duties during the alleged unlawful conduct, is also immune from liability under a state law tort theory.[4] On this score, Under Pennsylvania law, the Commonwealth, its agencies and employees enjoy broad immunity from most state-law tort claims, as the General Assembly has by statute provided that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. § 2310; see also Moore v. Commonwealth, 538 A.2d 111, 115 (Pa. Commw. Ct. 1988) ("In other words, if the

---

[4] We note that Defendant Klinefelter has not raised the issue of sovereign immunity in his motion for partial summary judgment, however we are empowered to raise the issue *sua sponte*. United States v. Bein, 214 F.3d 408, 412 (3d Cir. 2000) ("[A] claim of sovereign immunity advances a jurisdictional bar which a party may raise at any time, even on appeal, and which the court may raise *sua sponte*.").

Commonwealth is entitled to sovereign immunity under Act 152, then its officials and employees acting within the scope of their duties are likewise immune"). This grant of immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" Larsen v. State Employees' Ret. Sys., 553 F.Supp.2d 403, 420 (M.D. Pa. 2008). Conduct of an employee is within the scope of employment if "'it is of a kind and nature that the employee is employed to perform; [and] it occurs substantially within the authorized time and space limits ....' " Brautigan v. Fraley, 684 F.Supp. 2d 589, 593-94 (M.D. Pa. 2010); see also Faust v. Dep't of Revenue, 592 A.2d 835 (1991) (holding that a Commonwealth employee was protected under sovereign immunity from liability from intentional acts which caused emotional distress when he was acting within the scope of his duties). Thus, so long as the agent or employee is acting within the scope of his employment, and none of the nine recognized statutory exceptions apply,[5] sovereign immunity will bar any state law claims against him.

---

[5] In 42 Pa. Cons. Stat. § 8522(b), the General Assembly defined nine separate, narrow exceptions to the broad grant of sovereign immunity. These exceptions include: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. "Because of the clear intent to insulate government from exposure to tort

In particular, as this Court has noted in the past:

> Pennsylvania courts have consistently found sovereign immunity applies to intentional torts. See La Frankie, 618 A.2d at 1149; see also Stone v. Felsman, No. 3:10–CV–0442, 2011 WL 5320738 at *11 (M.D. Pa. Nov. 1, 2011) (finding state law claims of assault, battery, false arrest, false imprisonment and malicious prosecution are barred by sovereign immunity); Fischer v. Pa. State Police, No. 4:07–CV–1653, 2009 WL 650251 at *12 (M.D. Pa. March 10, 2009) (holding claim of intentional infliction of emotional distress against Pennsylvania State Police is barred by sovereign immunity).

Luck v. Asbury, No. 3:12CV0887, 2013 WL 433536, at *4 (M.D. Pa. Feb. 5, 2013). Therefore, "[a]s a general matter, subject only to nine specific statutory exceptions, this sovereign immunity bars state law tort claims like those alleged here, since Commonwealth employees are immune from liability for either negligence or intentional torts." Colon v. Kenwall, No. 1:18-CV-840, 2018 WL 5809863, at *6 (M.D. Pa. Nov. 6, 2018) (citations omitted).

The sovereign immunity defense is also subject to another exception for local municipal agencies and their employees. Thus, under 42 Pa.C.S.A. § 8550:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

liability, the exceptions to immunity are to be strictly construed." Lockwood v. City of Pittsburgh, 561 Pa. 515, 751 A.2d 1136, 1139 (Pa. 2000) (citation omitted).

42 Pa. Stat. and Cons. Stat. Ann. § 8550 (West).

Here it cannot be said that the acts of Officer Klinefelter, in relying on the statements of the loss prevention manager that a crime had occurred, engaged in an act that constituted a crime, actual fraud, actual malice, or willful misconduct. Indeed, while the undisputed facts raise questions as to the motivations of the loss prevention manager in investigating and detaining the plaintiff, the plaintiff himself seems to deny that he believed Officer Klinefelter acted with malicious intent. It seems only that he alleges and testified that Officer Klinefelter, in relying on the allegedly biased statements of Reder, failed to properly investigate. Since Commonwealth employees are immune from intentional torts except in situations constituting a crime, actual fraud, actual malice, or willful misconduct, which undisputedly did not occur here on the part of Officer Klinefelter, he is entitled to immunity from these tort claims.

**D. The Plaintiff Cannot Show Officer Klinefelter Unlawfully Discriminated Against Him**

In addition, the undisputed facts of this case simply do not show that Officer Klinefelter violated Taalibuddeen's right to equal protection under the Fourteenth Amendment. Indeed, by the plaintiff's own account, Officer Klinefelter did not make any indication that he was arresting or investigating the plaintiff due to his race.

27

The plaintiff brings this equal protection claim against Defendant Klinefelter under the Fourteenth Amendment. As this court has summarized:

> The Fourteenth Amendment Equal Protection Clause declares that "[n]o State shall ... deny any person within its jurisdiction the equal protection of the laws." See U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). "The [E]qual [P]rotection [C]lause requires equality of treatment before the law for all persons without regard to race or color." Students for Fair Admissions, Inc. v. President of Harv. Coll., 600 U.S. 181, 205 (2023) (internal quotations omitted).
>
> To succeed on an equal protection claim based on selective enforcement or racial profiling, a plaintiff must show that police actions "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." See Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002). For the purpose of the first prong of this inquiry, a party must "show that [they are] a member of a protected class and that [they were] treated differently from similarly situated individuals in an unprotected class." See id. at 206. "Discriminatory effect may be proven by naming similarly situated members of an unprotected class who were not selected for the same search or, in some cases, by submitting statistical evidence of bias." Id. In racial profiling cases, "where it is often difficult to submit direct evidence that members of an unprotected class were not targeted for a search, statistical evidence of discrimination may be the only means of proving a discriminatory effect." See id. at 206 n.11.

Brown v. Kepple, No. 1:22-CV-00165, 2024 WL 4137313, at *8 (M.D. Pa. Sept. 10, 2024), dismissed sub nom. Brown v. Gap, Inc., No. 24-2822, 2024 WL 5497993 (3d Cir. Dec. 19, 2024).

28

Here, the plaintiff has presented no evidence of either discriminatory effect or discriminatory purpose on the part of Defendant Klinefelter. At the outset, although it is undisputed that the plaintiff is a member of a protected class, an African American male, beyond conclusory statements, he has presented no direct evidence that he was treated differently by Officer Klinefelter from similarly situated members of an unprotected class. More significantly, he has not shown evidence of any discriminatory purpose on the part of Officer Klinefelter. On the contrary, the plaintiff testified that he could not say whether Officer Klinefelter was racially profiling him and that "he didn't say anything racial or anything of that matter." (Doc. 55-6, at 34). On these undisputed facts, it cannot be said that a constitutional violation occurred here. Accordingly, we will grant summary judgment on this claim.

### E. **Questions of Fact Exists as to the Claims Against Walmart.**

Having concluded that Officer Klinefelter is immune from liability for the role he played in the plaintiff's arrest, we now address the claims against Walmart.[6] The

---

[6] We note that the Court's subject matter jurisdiction in this case originates from the federal constitutional claims lodged against Defendant Klinefelter and the plaintiff asserts only common law tort claims against Defendant Walmart. While we grant summary judgment on the constitutional claims challenged by Defendant Klinefelter in the instant motion, a constitutional claim of excessive force still remains unchallenged by this defendant. Moreover, even if the Court were to grant judgment in favor of Defendant Klinefelter on all of the constitutional claims, given the protracted nature of this litigation, which began nearly four years ago in 2022, and

plaintiff alleges that Walmart is liable for false arrest and false imprisonment for the actions of its loss prevention manager, Michelle Reder. As our sister court has explained:

> False arrest and false imprisonment are "nearly identical claims" that are "generally analyzed together," Brockington v. Phila., 354 F.Supp.2d 563, 570 n. 8 (E.D. Pa. 2005) (citing Gagliardi v. Lynn, 446 Pa. 144, 285 A.2d 109 (1971). Specifically, false arrest is one made "without probable cause." The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention, where such detention is unlawful if it is the consequence of a false arrest. Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289, 293 (1994).
>
> Thus, "the proper [initial] inquiry in a . . . claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir.1988). Probable cause, in turn, exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir.2003).

Karkut v. Target Corp., 453 F. Supp. 2d 874, 879 (E.D. Pa. 2006). With regard to whether the detention of an individual by a merchant is unlawful, Pennsylvania's

---

the fact that the parties have completed discovery in this forum, considerations of judicial economy, convenience, and fairness to the parties all weigh in favor of this court exercising supplemental jurisdiction over any remaining state law claims against Walmart. See Patel v. Meridian Health Sys., Inc., 666 F. App'x 133, 136 (3d Cir. 2016) ("A district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction, unless considerations of judicial economy, convenience, or fairness to the parties provide an affirmative justification for exercising supplemental jurisdiction.").

Retail Theft statute permits a merchant to detain an individual if there was probable cause to believe that a retail theft had occurred. 18 Pa. Con. Stat. § 3929 (d).

Moreover, in Pennsylvania, liability for false arrest and false imprisonment can be imputed upon private parties who did not actually hold the plaintiff in custody but who prompted police to arrest the plaintiff if the private party "indirectly caused an arrest by making a false report." Braswell v. Wollard, 2020 PA Super 279, 243 A.3d 973, 980 (2020) (citing Doby v. Decrescenzo, 1996 WL 510095, at *13 (E.D. Pa. Sept. 9, 1996) (finding defendant could be liable for false arrest/imprisonment "if he has either knowingly provided false information to authorities or knowingly provided incomplete, misleading information to the authorities which resulted in the detention of another."); Martucci v. Borough of Milford, 2018 WL 1755728 (M.D. Pa. Apr. 10, 2018); Davila v. United States, 247 F.Supp. 3d 650, 658-59 (W.D. Pa. 2017); Reiber v. Fillipone, 2016 WL 7034704 (E.D. Pa. Dec. 2, 2016); Gilbert v. Feld, 788 F.Supp. 854, 862 (E.D. Pa. 1992)).

Thus, whether probable cause existed to arrest or detain[7] an individual, is an essential element of both claims. Here, as we noted above, questions remain about

---

[7] Walmart also generally avers that Taalibuddeen was, at all times prior to his arrest, free to go and thus was not detained at any time by Walmart. In our view, questions of fact exist as to whether the plaintiff was, in fact, actually free to leave the store after he was approached by loss prevention since he testified that Reder told him not to go anywhere and even had people follow him to the bathroom giving him the impression that if he had tried to leave "it would have been a huge problem." (Doc.

several aspects of the probable cause determination in this case none of which are answered undisputedly by the evidence in the record, which consists primarily of the conflicting statements of the parties. Thus, while we concluded above that Officer Klinefelter's conduct in arresting the plaintiff did not transgress the plaintiff's clearly established constitutional rights since he relied on the evidence of the loss prevention manager in arresting the plaintiff, we stopped short of concluding that probable cause existed as a matter of law. These questions of fact regarding what evidence the parties relied upon to conclude the plaintiff had committed retail theft are more pronounced when considering whether Walmart had probable cause to detain the plaintiff, since the plaintiff alleges that the actions of Walmart's loss prevention manager were tainted by racial animus.

Walmart argues they had probable cause to detain the plaintiff and call the police accusing him of committing retail theft both because the items he scanned did not match the actual prices of the merchandise and because Michelle Reder alleges she saw him put SD cards in his pocket but he did not purchase any SD cards.

First, with regard to the alleged switching of the tags, Pennsylvania's Retail Theft statute does clearly state:

> A person is guilty of a retail theft if he . . . alters, transfers or removes any label, price tag marking, indicia of value or any other markings

---

55-6, at 24). Nonetheless, as noted, Walmart could still be liable for his arrest if a jury found it was based upon Reder's false reports to Officer Klinefelter.

which aid in determining value affixed to any merchandise displayed, held, stored or offered for sale in a store or other retail mercantile establishment and attempts to purchase such merchandise personally or in consort with another at less than the full retail value with the intention of depriving the merchant of the full retail value of such merchandise.

18 Pa. Stat. and Cons. Stat. Ann. § 3929(a)(2). Thus, the question is whether probable cause existed to believe the plaintiff had switched the tags on the merchandise he purchased to deprive Walmart of their full retail value.

At the outset, the defendants' arguments about their knowledge of the alleged crime return to what they viewed in the surveillance footage. But it appears from Defendant Klinefelter's statement of facts that Michelle Reder based her suspicion that the plaintiff had committed retail theft on his behavior throughout the store, the fact that he removed SD cards from a shelf that only associates were supposed to access, and the fact that the plaintiff scanned a tag that reflected the incorrect price on the futon. (Doc. 56, ℙ 42). Moreover, the plaintiff alleges that Reder stated, "I can guarantee if I check the cameras, I will see you committing this crime because I know your type," (Doc. 7, ℙℙ 15-16). And Reder's affidavit does not state she saw Taalibuddeen switch the barcodes before calling the police. (Doc. 53-2). Thus, it does not appear that anyone alleges Reder had reviewed the surveillance footage which allegedly showed the plaintiff switching the tags before she called the police. Nor is it clear that the surveillance footage the parties viewed together showed the plaintiff switching the tags. Indeed, each of the parties states the footage showed

33

something slightly different – the plaintiff testified it showed nothing, (Doc. 55-6, at 25), Klinefelter states that it showed where the futon and area rug were obtained as well as where the barcode switching occurred, (Doc. 53, ₧ 44), and Reder's affidavit states only that, when the parties watched the video together she identified to Officer Klinefelter where the plaintiff took the SD memory cards and placed them into his pocket, and where he obtained the futon and area rug. (Doc. 53-2, ₧ 38). Based upon this evidence, it remains an open question what the parties observed on video with regard to the switching of the tags of the merchandise. The plaintiff maintains that he did not know why there were four different barcodes on the futon box and he believed the price he paid for the rug was correct. (Doc. 55-6, at 21).

With respect to the SD cards, Walmart focuses on the *prima facie* presumption laid out in the Pennsylvania Retail Theft statute but selectively omits a key portion of the section. On this score, the statute states:

> **(c) Presumptions.**--Any person intentionally concealing unpurchased property of any store or other mercantile establishment, either on the premises or outside the premises of such store, shall be prima facie presumed to have so concealed such property with the intention of depriving the merchant of the possession, use or benefit of such merchandise without paying the full retail value thereof within the meaning of subsection (a), *and the finding of such unpurchased property concealed, upon the person or among the belongings of such person, shall be prima facie evidence of intentional concealment*, and, if such person conceals, or causes to be concealed, such unpurchased property, upon the person or among the belongings of another, such fact shall also be prima facie evidence of intentional concealment on the part of the person so concealing such property.

18 Pa. Stat. and Cons. Stat. Ann. § 3929.

Walmart's summary of the statute tellingly omits the portion stating "the finding of such unpurchased property concealed, upon the person or among the belongings of such person, shall be *prima facie* evidence of intentional concealment." Walmart then attempts to compare the instant case with <u>Karkut v. Target Corp.</u>, 453 F. Supp. 2d 874, 880 (E.D. Pa. 2006), where the Eastern District found probable cause existed to arrest an individual who had concealed items of clothing in a bag and exited the store without paying for them. But in <u>Karkut</u> and each of the cases in which it relies, the items which were allegedly stolen were recovered on the person. <u>Id.</u> at 880 (citing <u>Angelopoulos v. Lazarus PA Inc.</u>, Pa. Super., 884 A.2d 255 (2005); <u>Commonwealth v. Lacy</u>, 324 Pa. Super. 379, 471 A.2d 888 (Pa. Super. 1984). Here, the defendants allege Reder and Klinefelter viewed the plaintiff putting SD cards in his pockets on the surveillance video. (Doc. 53, ₱ 44; Doc. 56, ₱ 48). The plaintiff testified that he removed one SD card from the shelf but later decided not to buy it. (Doc. 55-6, at 19). And, while Reder's affidavit states she believed the plaintiff flushed the SD cards down the toilet, there is simply no evidence of this beyond Reder's stated suspicions. In fact, Klinefelter met the plaintiff in the bathroom and did not locate any SD cards. (Doc. 53, ₱ 41). Thus, it appears the SD cards were never found either on the person or elsewhere. In our

35

view, this simply cannot support a finding of probable cause as a matter of law. Moreover, a jury could find that these statements by Reder that the plaintiff flushed the SD cards down the toilet could be interpreted by a jury as "knowingly provid[ing] incomplete, misleading information to the authorities which resulted in the detention of another," Doby, 1996 WL 510095, at *13, such as to impute liability upon Walmart for the plaintiff's arrest.

Finally, the factual inconsistencies and gaps which guide our decision to decline to find probable cause existed as a matter of law are compounded by the fact that the plaintiff has identified evidence, in the form of the plaintiff's sworn testimony, from which a jury could conclude Reder's decision to detain and report the plaintiff was motivated not by the desire to bring him to justice but by racial animus, specifically that Reder stated, "I can guarantee if I check the cameras, I will see you committing this crime because I know your type," then clarifying, "you know what I mean, you Niggers are always trying to get over." (Doc. 7, ¶¶ 15-16). While Reder and Walmart deny this, a finding on this score would require credibility determinations exclusively reserved for the jury and not suitable to resolution on summary judgment. In our view, given the conflicting accounts of the evidence within the knowledge of the defendants and about whether the loss prevention manager at Walmart called the plaintiff a racial slur and admitted to racially profiling him, summary judgment is not appropriate on these claims.

36

This is also true with regard to the plaintiff's malicious prosecution claim. As the Court foreshadowed at the motion to dismiss stage:

> Under Pennsylvania law, a plaintiff asserting a malicious prosecution claim must show "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice." Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d. Cir. 2000). Malice has been defined as "ill will in the sense of spite, lack of belief, by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." Lippay v. Christos, 996 F.2d 1490, 1502 (3d. Cir. 1993). "Malice may be inferred from the absence of probable cause." Id. "Probable cause is proof of facts and circumstances that would convince a reasonable, honest person that the suspected person is guilty of a criminal offense." Id.
>
> In some circumstances, a private defendant may be liable for malicious prosecution under Pennsylvania law. But "private individuals can only be liable for initiating criminal proceedings under limited circumstances, because officers generally exercise their own discretion in bringing cases against criminal defendants." Tice v. PSP Trooper Tyler Prisk, No. 4:23-CV-00823, 2023 WL 7004427, at *3 (M.D. Pa. Oct. 24, 2023). "Usually, the malicious prosecution action then lies against the officer for choosing to initiate a proceeding rather than the private citizen." Id. "But 'it is not necessary that one who procures the institution of criminal proceedings actually file the charges and prepare the complaint.'" Id. (quoting Hess v. Lancaster Cnty., 514 A.2d 681, 684 (Pa. Commw. Ct. 1986)). Rather, a private defendant initiates criminal proceedings "where either (1) the private person's desire to have the proceeding initiated was the 'determining factor in the commencement of the prosecution,' for example, through urging officers to prosecute the case; or (2) the public official acted upon the person's false information in carrying out the arrest." Id. "In either circumstance, the actions of the private person preclude the officer from exercising his own discretion in deciding to carry out the prosecution." Id.

. . .

> Taalibuddeen alleges that Reder admitted that she did not see Taalibuddeen place the barcodes on the box; she thought, however, that based on his race, the video surveillance footage would show Taalibuddeen doing so; but the video surveillance footage did not show Taalibuddeen doing so. Doc. 7 ¶¶ 15, 16, 19. Taalibuddeen also alleges that Officer Klinefelter failed to properly investigate the incident, had no probable cause to arrest him, and when Taalibuddeen told him that "he had been racially profiled as he was being charged with no evidence," Officer Klinefelter responded that he believed Reder. Id. ¶¶ 21, 22. Given these allegations, we cannot say at this early stage of the proceedings that Officer Klinefelter exercised his own discretion in charging Taalibuddeen.

(Doc. 35, at 34-35).

Even with the benefit of discovery at this stage, the same questions of fact exist with regard to the information provided by Walmart and relied upon by Officer Klinefelter in effectuating the arrest of the plaintiff and whether this decision to initiate charges against the plaintiff was based upon Reder's false information motivated by racial animus. At the outset, it is undisputed that criminal charges were initiated against the plaintiff which were later dropped. Moreover, as previously discussed, questions remain with regard to the issue of probable cause. Indeed, the affidavits and depositions of the parties provide no more clarity with regard to whether or not Reder actually saw Taalibuddeen switch the tags on the merchandise before calling the police and telling Officer Klinefelter she suspected he had committed retail theft. Moreover, the evidence is disputed as to whether

38

Taalibuddeen placed the SD cards in his pocket and intended to remove them from the store since no SD cards were ever recovered on the plaintiff's person. And, to the extent Walmart argues that it was in Officer Klinefelter's own discretion that he initiated charges against the plaintiff, Officer Klinefelter argues that he relied upon the information provided to him by Reder in formulating probable cause to arrest the plaintiff. Thus, in our view, a jury could find that Officer Klinefelter directly relied upon the statements of Reder, which were motivated not by the desire to bring him to justice but by racial animus.

In sum, on summary judgment we are confined to consider the issues based upon the undisputed evidence viewed in the light most favorable to the nonmoving party, the plaintiff. Since genuine issues of fact exist with regard to whether the Walmart loss prevention manager's decision to detain and report the plaintiff to the police was supported by probable cause or tainted by racial animus, we will deny Walmart's motion for summary judgment on these claims.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Date: April 10, 2026